**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF TENNESSEE**
**AT CHATTANOOGA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| | ) | |
| **v.** | ) | **No. 1:23-cr-37** |
| | ) | **JUDGE ATCHLEY** |
| **JARED BROOME** | ) | |

## MOTION TO SUPPRESS PHYSICAL EVIDENCE, STATEMENTS, AND REQUEST FOR *FRANKS* HEARING

The accused, Jared Broome, by and through undersigned counsel, and pursuant to Federal Rule of Criminal Procedure 12(b)(3)(C), the Fourth Amendment, and the Fifth Amendment to the United States Constitution, requests the issuance of an order suppressing statements and the evidence seized from a shed at the end of a private driveway located at 3801 Kingwood Circle, East Ridge, Tennessee. Mr. Broome also requests a *Franks* hearing to contest the constitutionality of the search warrant issued for a search of the shed.

### I.    RELEVANT FACTS

Each of the following events take place on January 18, 2023:

Arrival and Arrest of Mr. Broome:

1. At "approximately 1240 hours" Cpl. Beadle of the East Ridge Police Department (hereinafter referred to as "ERPD") observed a green Honda CRV registered to Mr. Jared Broome parked in the driveway of a home located at 3801 Kingwood Circle, East Ridge, TN (hereinafter referred to as "the home"). Defense Ex. 1. Cpl. Beadle was aware that Mr. Broome had warrants for his arrest in Hamilton County, TN. *Id.*

2. The home includes a backyard surrounded completely by a fence. Immediately north of the house, but within the property, is a driveway. Defense Ex. 2, p. 1. At the end of the

1

driveway, next to the fence, and roughly 15 feet from the back porch, is a metal shed (hereinafter referred to as "the shed"). *Id.* at 2. The shed is opaque. *Id.* at 3. The front doors slide open to either side. Immediately behind the front doors, there is a plastic partition. This plastic partition is *translucent*, not transparent. Facing the front of the shed, a person cannot see the inside of the shed without opening the front doors and pushing aside the plastic partition.

3. Wearing a body worn camera (hereinafter abbreviated to "BWC"), Cpl. Beadle walks to the front door of the home. Defense Exs. 3 & 4. Janice Sneed, Mr. Broome's grandmother, answers the door. *Id.*

4. Cpl. Beadle asks Ms. Sneed if Mr. Broome is present. *Id.* Ms. Sneed tells Cpl. Beadle that Mr. Broome is asleep "in the shed in the back." *Id.* She also informs Cpl. Beadle that Mr. Broome is living in the shed. *Id.*

5. Cpl. Beadle and three other officers walk to the shed behind the property and call for Mr. Broome to come outside. *Id.* A few seconds later, Ms. Sneed also calls for Mr. Broome to come outside. *Id.*

6. While the officers have their weapons drawn, Mr. Broome exits the shed at 12:43:19. Defense Ex. 4. Cpl. Beadle instructs Mr. Broome to "put [his] hands up." *Id.* Cpl. Beadle handcuffs Mr. Broome and informs Mr. Broome that "[he's] got warrants." *Id.*

7. Cpl. Beadle asks Mr. Broome how long he has been living in the shed. Mr. Broome says "a couple of days." *Id.*

8. Cpl. Beadle speaks into his radio: "We got one in custody at the moment." *Id.*

<u>First Warrantless Entry into the Shed</u>:

9. After handcuffing Mr. Broome, at 12:43:50, Cpl. Beadle asks Mr. Broome if Mr. Broome wants to grab his shoes which are in the shed. Defence Exs. 3 & 4. Mr. Broome responds "no," and that he can wear a pair of shoes laying outside the entrance to the shed.

10. Cpl. Beadle insists that Mr. Broome needs to wear the shoes that are in the shed, not the shoes outside the shed. *Id.* Cpl. Beadle says, "Can I grab [the shoes that are inside the shed]," and Mr. Broome finally mumbles "yeah." *Id.*

11. Seconds later, at 12:44:10, Cpl. Beadle enters the shed, purportedly to retrieve the pair of shoes. *Id.* Although the shoes are right inside the entrance of the shed, Cpl. Beadle shines his flashlight and "illuminates his surroundings by flashlight before and after retrieving [the] pair of shoes." *Id.*

12. At 12:44:28, Cpl. Beadle says, "here's his shoes," and hands the shoes to an officer standing outside of the shed. *Id.*

13. At 12:44:50, Cpl. Beadle exits the shed. *Id.*

<u>Questioning of Mr. Broome</u>:

14. A few minutes later beginning at 12:47:02, Cpl. Beadle begins to question Mr. Broome in the driveway a few yards away from the shed. *Id.* Mr. Broome is still handcuffed. Defense Ex. 4. Cpl. Beadle and three other officers surround Mr. Broome. *Id.* Cpl. Beadle begins to question Mr. Broome about the cars in the driveway. Defense Exs. 3 & 4.

15. At this point, no officer has provided any warnings against self-incrimination to Mr. Broome.

16. Next, at 12:47:27, the following exchange occurs:

3

**Cpl. Beadle**: "What's all in the shed that's illegal?" You got a little bit of pills and stuff in there?"

**Mr. Broome**: looks down, pauses, shakes his head from side to side, and denies having anything inside the shed.

**Cpl. Beadle**: "There ain't no pills in there right now?"

**Mr. Broome**: "There ain't nothing in there. I ain't got shit."

**Cpl. Beadle**: "You don't mind if I look then?"

**Mr. Broome**: "I don't consent to nothing, man."

Defense Exs. 3 & 4.

<u>Second Warrantless Entry into the Shed:</u>

17. Next, at 12:47:55, Cpl. Beadle instructs another officer to take Mr. Broome away to the police car. Defense Ex. 4.

18. Cpl. Beadle next summons Ms. Sneed, clarifies that Mr. Broome is residing in the shed, and requests her consent to enter the shed "to refrain from getting a search warrant." Defense Exs. 3 & 4.

19. In response to Cpl. Beadle's questions, Ms. Sneed explains that Mr. Broome keeps his "tools and stuff" in the shed. *Id.* Cpl. Beadle explicitly asks her, "[d]o you have stuff out there too, old tools and stuff?" to which Ms. Sneed responds, "[n]o, mostly its all his stuff." *Id.*

20. At 12:49:37, Ms. Sneed tells Cpl. Beadle "You're more than welcome to search it." *Id.* At this time, Mr. Broome is still on the property of the home near the driveway's entrance. Defense Ex. 4.

21. Next, Cpl. Beadle and another officer enter the shed and search the inside. Defense Exhibits 3 & 4. They neither state that they observe anything illegal or indicative of criminal activity, nor is anything apparent from the BWC.

Dog Sniff of the Shed:

22. About 70 minutes after, and without receiving consent from Ms. Sneed, at about 13:00, Cpl. Beadle brings a dog out from his police vehicle. Defense Ex. 5. For about four minutes, Cpl. Beadle has the dog sniff around the cars, the driveway, and the shed. *Id.* The dog jumps around energetically. *Id.*

Third Warrantless Entry into the Shed:

23. At 13:19:00, one of the officers approaches the shed and closes its doors. Defense Ex. 6.

24. At 14:06:50, Cpl. Beadle approaches, opens, and enters the shed again. Defense Ex. 7. Ms. Sneed is standing a few yards away in the backyard. *Id.*

25. At 14:07:58, Ms. Sneed asks the officers if they have gotten a search warrant. *Id.*

26. In response, Cpl. Beadle explains that he is grabbing what is in "plain view" and that he is about to leave to go get a judge to sign the search warrant. *Id.* He further explains that he will return upon obtaining a judge's signature to perform "an actual search of the place." *Id.*

Solicitation of the Search Warrant:

27. At some point after the third entry into the shed, but prior to 14:48 hours, the officers solicit a search warrant from Judge Charles Paty. Defense Ex. 8. Cpl. Beadle purportedly authors the affidavit in support of the warrant. *Id.* at p. 2.

28. The affidavit, which recites less than one full page of alleged facts, states that the officers arrested Mr. Broome *inside* the shed. *Id.* at p. 3.

5

29. The affidavit further asserts that "[w]hile inside the shed police observed in plain view a syringe, and multiple aluminum foil wrappers consistent with the use of fentanyl." *Id.* In addition, the affidavit says that officers observed "an end of [sic] glass pipe with residue in a box that was consistent with a pipe commonly used to smoke methamphetamine." *Id.*

30. The affidavit admits that Cpl. Beadle "deployed K9 Quest to conduct a free air sniff of the vehicles" and asserts that the dog began "pulling [Cpl. Beadle] towards the metal building." *Id.*

31. At 14:48 hours, Judge Charles Paty issues the search warrant. *Id.* at p. 1. At 15:03, Cpl. Beadle and the other officers return to the home a search the shed again. Defense Ex. 9. During this search, the officers discover a Mossberg 500 12-gauge shotgun behind the door of the shed. *Id.*

As a result of the foregoing, the United States has charged Mr. Broome with being a felon in possession of a firearm, in violation of 18 U.S.C. § 922(g)(1). Docket Entry 1.

## II.  ARGUMENT

The United States Constitution protects all persons from "unreasonable searches." U.S. Const. Amend. IV. "[T]he curtilage of the house . . . enjoys protections as part of the home itself," *Florida v. Jardines*, 569 U.S. 1, 6 (2013), and a warrantless entry of a person's home is per se unreasonable. *Payton v. New York*, 389 U.S. 347, 351 (1967). There exist only a few "jealously and carefully drawn" exceptions to the Fourth Amendment's warrant requirement. *Jones v. United States*, 357 U.S. 493, 499 (1958). However, these exceptions are "few" and "well-delineated." *Katz v. United States*, 389 U.S. 347, 357 (1967). The Supreme Court has emphasized that "police must, whenever practicable, obtain advance judicial approval of searches and seizures through the warrant procedure." *Terry v. Ohio*, 392 U.S. 1, 20 (1968). The

Sixth Circuit has likewise emphasized that "the warrant requirement is at the very heart of the Fourth Amendment" and that "judicial exceptions to it are only exceptions." *United States v. Haddix*, 239 F.3d 766, 768 (6th Cir. 2001).

The United States bears the burden of proving that a warrantless search was reasonable and did not violate the Fourth Amendment. *United States v. Washington*, 573 F.3d 279, 286 (1951).

### A. The First Entry of the Shed Exceeded the Scope of Any Consent that Mr. Broome May Have Given to Officer Beadle.

Officers may conduct a warrantless search if they receive consent to search the item or property at issue. *Schneckloth v. Bustamonte*, 412 U.S. 218, 219 (1973). However, "[a] suspect may of course delimit as he chooses the scope of the search to which he consents." *Id.*

Here, Mr. Broome never consented to a search of the shed. At most, Mr. Broome may have mumbled "Yeah" in response to Cpl. Beadle's plea to grab his shoes. This response defined the scope of Cpl. Beadle's ability to enter the shed without violating the Fourth Amendment. At most, Mr. Broome consented to a brief entry into the shed to grab his *shoes*, not to search for evidence. Within a second or two of entering, Cpl. Beadle finds Mr. Broome's shoes. However, Cpl. Beadle overstood his welcome; his actions became unconstitutional after he remained inside the shed, turned on his flashlight, and searched the shed. Cpl. Beadle finds the shoes a second or two after 12:44:10. However, after accomplishing the purpose of the warrantless entry to which Mr. Broome may have consented, he stays inside and enthusiastically looks around.[1] At 12:44:27, he hands the shoes to an officer outside of the shed. Despite this, Cpl. Beadle remains

---

[1] To be clear, Mr. Broome does not concede that he consented to any entry to the shed at all. It remains the government's burden to prove the validity of a consent search. *See Schneckloth*, 412 U.S. at 222. Mr. Broome's argument is in the alternative; even if the Court finds that he consented to a brief warrantless entry to the shed to retrieve a pair of shoes, Cpl. Beadle remained longer than necessary to fulfill this objective.

inside the shed for an additional 23 seconds and does not leave until 12:44:50. In total, Cpl. Beadle spent roughly 40 seconds inside the shed, egregiously longer than necessary to receive Mr. Broome's shoes, which were right inside the door. Perhaps more notably, Cpl. Beadle does not mention seeing anything of investigative interest during or immediately after the first warrantless entry. However, if Cpl. Beadle did observe something that lead to further investigation, his observation would have been the result of a search that exceeded the consented purpose of the warrantless entry.

**B. Officers Violate the Fourth Amendment When They Perform a "Consent" Search When a Physically Present Co-Occupant Refused Consent.**

Officers may lawfully search a home or its curtilage if they receive consent to search from an occupant with apparent authority to consent. *Illinois v. Rodriguez*, 497 U.S. 177, 181 (1990). However, "a physically present co-occupant's stated refusal to permit entry prevails" and "renders the warrantless search unreasonable and invalid as to him." *Georgia v. Randolph*, 547 U.S. 103, 106 (2006). In *Randolph*, the defendant's wife consented to a search of the home, but the defendant, who was also present at the time, "unequivocally refused." *Id.* at 107. Despite this, law enforcement entered the defendant's home and uncovered evidence. The Supreme Court held that this search was unlawful as applied to the defendant, clarifying that "a physically present inhabitant's express refusal of consent to a police search [of his home] is dispositive as to him, regardless of the consent of a "fellow occupant." *Id.* at 122-23. The Court further emphasized that "[d]isputed permission" is insufficient to support "the central value of the Fourth Amendment. *Id.* The Court went so far as to establish a bright-line rule: the objecting co-occupant's physical presence is dispositive "[s]o long as there is no evidence that the police have

removed the potentially objecting tenant from the entrance for the sake of avoiding a possible objection." *Id.* at 121.

The Sixth Circuit has likewise enforced the bright-line rule from *Randolph*. *See, e.g.*, *United States v. Johnson*, 656 F.3d 375 (6th Cir. 2011) (finding that the warrantless search of a bedroom was unreasonable despite wife and mother-in-law's consent because defendant was physically present and expressly refused consent); and *Pratt v. United States*, 214 Fed.Appx. 532 (6th Cir. 2007) (holding that search was valid when defendant was not present when mother consented to a search of his room and his mother had actual authority to consent).[2]

Here, Cpl. Beadle and the other officers had only disputed permission to enter the shed after Mr. Sneed consented. Mr. Broome unequivocally refused consent when he responded "I don't consent to nothing man" to Cpl. Beadle's request. This situation is analogous to *Randolph* and *Johnson*, and dissimilar to *Pratt*. Even assuming that both Mr. Broome and his grandmother had a privacy interest in the shed, they were both present at the home at the time officers requested consent, and one of them, Mr. Broome, refused consent. Like the defendant in *Randolph*, Mr. Broome's "stated refusal to permit entry prevails." *Randolph*, 547 U.S. at 106. Therefore, the officers did not have constitutionally valid consent to conduct the second warrantless entry of the shed.

The Supreme Court slightly adjusted the *Randolph* rule for the "very different situation" where "consent was provided by an abused woman well after her male partner had been removed from the apartment they shared." *Fernandez v. California*, 571 U.S. 292, 294 (2014). In *Randolph*, a woman appeared to be crying when officers knocked on the door of the defendant's

---

[2] Mr. Broome does not concede that Ms. Sneed had any actual authority to consent to either a search of the shed generally or a search of any containers located inside the shed. However, even assuming that she qualified as a co-occupant with actual authority, Mr. Broome's affirmative and unequivocal refusal controls over Ms. Sneed's statements.

apartment. *Id.* at 295. The woman told officers that she had just been in a fight, and the officers "saw blood on her shirt and hand from what appeared to be a fresh injury." *Id.* Next, the defendant appeared at the door and adamantly refused consent for the officers to enter the apartment. *Id.* at 296. The officers arrested the defendant for assault and removed him to the police station for booking. *Id.* About an hour later, the officers returned to the apartment and obtained verbal and written consent from the woman to search. *Id.* In *Fernandez*, the Court reasoned that the officers had removed the defendant from the scene not to avoid his refusal to consent, but rather because they "had reasonable grounds for removing him so they could speak with . . . an apparent victim of domestic violence." *Id.* at 303. More explicitly. The Court held that "an occupant who is absent due to a lawful detention or arrest stands in the same shoes as an occupant who is absent for any other reason." *Id.*

Mr. Broome's case is distinguishable from *Fernandez*. There were no exigent circumstances of domestic violence. While the officers in *Fernandez* arrested the defendant, drove him to police station, and booked him before going back to speak to the woman an hour later, Cpl. Beadle dismissed Mr. Broome and immediately summoned Ms. Sneed and requested her consent instead. Although not stated explicitly in his audio, Cpl. Beadle appears to have removed Mr. Broome because he thought he could avoid the issues with his refused consent by simply speaking to his grandmother. In other words, Cpl. Beadle moved Mr. Broome away "for the sake of avoiding a possible objection," breaking the bright-line rule. *Randolph*, 547 U.S. at 121. Therefore, because the officers only received disputed consent, and because they broke the bright-line rule in *Randolph*, the second warrantless entry violated the Fourth Amendment.

C. **The Court Must Suppress Statements Obtained in Violation of Mr. Broome's Fifth Amendment Right Against Self-Incrimination.**

    i.    *Officer Beadle's Questions Were an Interrogation Because They Were Designed to Solicit Incriminating Responses from Mr. Broome.*

The Supreme Court defines interrogation as "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." *Miranda v. Arizona*, 384 U.S. 436, 444 (1966). Interrogation "refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response." *Rhode Island v. Innis*, 446 U.S. 291, 300-01 (1980).

Here, Cpl. Beadle should have reasonably known to expect an incriminating response from Mr. Broome when he asked, "What's all in the shed that's illegal? You got a little bit of pills and stuff in there?" and "There ain't no pills in there right now?" Cpl. Beadle's questions and statements called for Mr. Broome to divulge information about the presence and possession of contraband. Such contraband would presumably include a firearm that the United States alleges Mr. Broome cannot possess. Because of this, Officer Beadle's questioning of Mr. Broome is an interrogation under *Miranda*'s definition.

    ii.    *Mr. Broome Was in Custody When Responding to the Cpl. Beadle's Questions.*

*Miranda* protections apply "where there has been such a restriction on a person's freedom as to render him 'in custody.'" *Stansbury v. California*, 511 U.S. 318, 322 (1994). "Custodial interrogations" occur when there is "questioning initiated by law enforcement after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." *Miranda*, 384 U.S. at 444. Whether a person is in custody "depends on the objective circumstances of the interrogation, not on the subjective views harbored by the

11

interrogating officers or the person being questioned." *Id.* at 325. However, "[a]n officer's knowledge or beliefs may bear upon the custody issue *if they are conveyed, by word or deed, to the individual being questioned.*" *Id.* (emphasis added). Courts are to look at the "totality of the circumstances," including any circumstances that "would have affected how a reasonable person" in the suspect's position would "perceive his or her freedom to leave." *Id.*

Here, Mr. Broome was in custody the moment the officers drew their weapons, told him to exit the shed, and handcuffed him. The officers used force by drawing and aiming their weapons, presumably ready to use force if Mr. Broome did not comply. Moreover, handcuffing Mr. Broome restricted his ability to move. Furthermore, Cpl. Beadle conveyed his knowledge of Mr. Broome's warrants to Mr. Broome, making it explicitly clear that he intended to take Mr. Broome into custody. Further still, the officers outnumbered Mr. Broome four to one, and surrounded him as Cpl. Beadle interrogated him about the possible contents of the shed. Therefore, not only did the handcuffs restrict Mr. Broome's movement, but the presence, number, and positioning of the four officers did so as well. A reasonable person in this situation would not have felt safe or free to leave. For this, Mr. Broome was in custody when the interrogation occurred.

  iii. *The Fifth Amendment Requires Pre-Interrogation Warnings as "An Absolute Prerequisite" for Any Custodial Interrogation.*

The Fifth Amendment instructs that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself." U.S. Const. Amend. V. Because of this, pre-interrogation warnings against self-incrimination are an "absolute prerequisite" for any custodial interrogation. *Miranda*, 384 U.S. at 471. The Court in *Miranda* held that "the prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the

12

privilege against self-incrimination." *Id.* at 444. The Court further explained that "if a person in custody is to be subjected to interrogation, he must first be informed in clear and unequivocal terms that he has the right to remain silent." *Id.* at 468. A person in custody also "must clearly be informed that he has the right to consult with a lawyer and to have the lawyer with him during interrogation." *Id.* at 471.

As established above, Mr. Broome was in custody when Cpl. Beadle interrogated him. However, no officer informed Mr. Broome that he had the right to remain silent and to not answer any of their questions. In the BWC footage, no officer provides any *Miranda* warnings. Despite this, Cpl. Beadle proceeded to solicit incriminating verbal and nonverbal statements from Mr. Broome. Because the officers did not provide the prerequisite warnings, this Court must suppress Mr. Broome's statements from trial.

### D.  The Dog Sniff Around the Shed, the Driveway, and the Curtilage of the Home Was an Unconstitutional Search.

"The government's use of trained police dogs to investigate the home and its immediate surroundings is a 'search' within the meaning of the Fourth Amendment." *Florida v. Jardines*, 569 U.S. 1, 11-12 (2013). In *Jardines*, the officers approached the front porch of the defendant's home accompanied by a "drug-sniffing dog." *Id.* at 3-4. The dog began "energetically exploring the area." *Id.* at 4. The dog next sat at "the base of the front door," which was "the trained behavior upon discovering the [odor of contraband]'s strongest point." *Id.* Based on the dog's behavior, the officer acquired a search warrant to search the residence." *Id.* The Court in *Jardines* held that the dog-sniff search was unlawful because the officers gathered the information included in the search warrant "by physically entering and occupying the area to engage in conduct not explicitly or implicitly permitted by the homeowner." *Id.* at 6. In other

words, the officers lacked consent to perform any search, including a dog sniff. The Court reasoned that "the right of a [person] to retreat into his own home and there be free from unreasonable governmental intrusion . . . would be of little practical value if the state's agents could stand in a home's porch or side . . . and trawl for evidence with impunity." *Id.*

Like the dog in *Jardines*, Cpl. Beadle's dog energetically explored the area in the driveway and around the shed. Like the search warrant in *Jardines*, affidavit includes that the dog alerted toward the shed. Also, like the officers in *Jardines*, Cpl. Beadle and the other officers lacked a search warrant when the dog-sniff occurred. As discussed above, Mr. Broome refused consent to a search, so Cpl. Beadle lacked consent to perform a dog sniff search. Since a dog sniff of curtilage is a search under the Fourth Amendment, Cpl. Beadle's dog sniff was an unconstitutional search because he had neither consent nor a search warrant.

### E. The Third Warrantless Entry into the Shed Was Unconstitutional Because It Occurred Prior to the Search Warrant and Was Not a "Plain View" Search.

Officers may seize evidence that is in plain view without a warrant if they are "lawfully in a position from which they view an object, if its incriminating character is immediately apparent, and if the officers have a lawful right of access to the object." *United States v. Galaviz*, 645 F.3d 347, 355 (6th Cir. 2011).

Here, the officers lacked all three requirements for the plain view doctrine to apply to the third warrantless entry into the shed. The doors of the shed were closed. As explained above, the shed is opaque and a person cannot see inside without opening the doors and passing through the partition. The third warrantless entry occurred when one of the officers approached the shed, opened the doors, and went inside. This entry occurred prior to obtaining the search warrant, and because of *Randolph*, lacked consent. Therefore, the officers were not in a lawful position to

view any incriminating evidence that may have existed in the shed. Moreover, even if they *could* enter the shed, they shuffled items around, opened containers, and greatly disturbed the inside of the shed to grab what they claimed was "in plain view." Because they had to move items around, they were not collecting items in plain view and nothing of a criminal character could have been immediately apparent just from viewing the inside of the shed. Because of this, the third warrantless entry was unconstitutional and cannot find shelter in the plain view exception to the warrant requirement.

**F.  The Execution of the Search Warrant Was Unlawful Because Law Enforcement Misled a Magistrate into Issuing a Search Warrant.**

   i.  *Courts Must Void a Search Warrant Where the Officer's Reckless Disregard for the Truth Misled a Magistrate Judge into Finding Probable Cause.*

The Fourth Amendment prevents a magistrate judge from issuing a search warrant "but upon probable cause, supported by oath or affirmation." U.S. Const. Amend, IV. Probable cause exists when the totality of the circumstances shows "a fair probability that contraband or evidence of a crime will be found in a particular place." *Illinois v. Gates*, 462 U.S. 213, 238 (1983). Generally, "[t]here is a presumption of validity with respect to the affidavit supporting the search warrant." *Franks v. Delaware*, 438 U.S. 154, 171 (1978). However, a complete denial of the chance to test the basis of a search warrant risks "denud[ing] the probable cause requirement of all real meaning" because otherwise a court may never become aware that law enforcement "deliberately falsified allegations to demonstrate probable cause" and "misled the magistrate." *Id.* at 168. For this, the Court in *Franks* held that a defendant may challenge the validity of a search warrant if he can make two findings: first, the defendant must show by a preponderance of the evidence that law enforcement made "a false statement knowingly and

intentionally, or with reckless disregard for the truth." *Id.* at 155-56. Second, the defendant must show that the "allegedly false statement is necessary to the finding of probable cause." *Id.* at 156.

Once a defendant has made the preliminary showings, the Court must set aside the subject material and determine whether "there remains sufficient content in the warrant to support a finding of probable cause." *Franks*, 438 U.S. at 173. If it is not, "the search warrant must be voided and the fruits of the search excluded to the same extent as if probable cause was lacking on the face of the affidavit." *Id.* at 156.

Likewise, a defendant is entitled to a *Franks* hearing if he makes the two preliminary showings as to material omissions from the affidavit. *McCallum v. Geelhood*, 742 Fed.Appx. 985, 991 (6th Cir. 2018). That is, "an officer cannot rely on a judicial determination of probable cause if that officer knowingly makes false statements *and omissions* to the judge such that but for these falsities the judge would not have issued the warrant." *Yancey v. Carroll County*, 876 F.2d 1238, 1243 (6th Cir. 1989) (emphasis added). "Such reliance is unreasonable, and detention of an individual pursuant to such deceptive practices violates the Fourth Amendment." *Gregory v. City of Louisville*, 444 F.3d 725, 758 (6th Cir. 2006).

ii. *The Affidavit Has Material Omissions because It Does Not Mention Any of the Three Warrantless Entries into the Shed to Obtain the Evidence that was Used as a Basis for the Warrant.*

Here, the affidavit for search warrant contains materially false statements and omissions that were necessary to the finding of probable cause. At best, these statements and omissions were made recklessly, but the severity of the false statements and omissions indicates that they were made knowingly or intentionally in order convince Judge Charles Paty to issue the warrant. First, the affidavit states that "[p]olice arrested Mr. Broome inside the shed." This is untrue. Although Mr. Broome was inside the shed when the officers arrived, the BWC footage demonstrates that Mr. Broome exited the shed and was then placed in handcuffs. This statement

16

is material because the affidavit asserts that the officers saw drug paraphernalia in plain view "[w]hile inside the shed"—presumably only while making a lawful arrest.

Worse, the affidavit omits several facts in the sequence of events that led to the officers seeking the search warrant. These omissions should have been included in paragraphs 3 through 5 of the affidavit. First, the affidavit omits the fact that Cpl. Beadle remained in the shed much longer than necessary to retrieve Mr. Broome's shoes (the first warrantless entry). The affidavit also omits that Mr. Broome refused consent for the officers to perform a search for narcotics inside the shed (the second warrantless entry). It omits that the Cpl. Beadle removed Mr. Broome to get consent from his grandmother. It omits any of the dialogue between Cpl. Beadle and Mr. Broome. Importantly, it also omits that upon searching the shed after receiving "consent" from Ms. Sneed, that Cpl. Beadle found nothing.

Further still, the affidavit omits the third warrantless entry where the officers again approach the shed, open the door, and *rummage through the items* prior to seeking the warrant (the supposed "plain view" seizure of evidence during the third warrantless entry). These omissions avoided making Judge Paty aware of the Fourth Amendment violations that occurred in uncovering the factual allegations included in the search warrant. The officers conducted three warrantless entries but mentioned *none* of them in the affidavit. Although the affidavit alludes to the officers being "inside the shed" at some point, it neglects to include *how* the officers got inside the shed—and affirmatively misstates that Mr. Broome was arrested inside the shed, thus giving the false impression that items were view "in plain sight" as part of Mr. Broome's arrest. The information included in the four corners of the affidavit indicate that the officers entered the shed to make an arrest and saw paraphernalia while performing the arrest. This is not what occurred. The above omissions matter because, had these omissions been included, Judge Paty

would have known that the source of the information included in the warrant was the result of several Fourth Amendment violations, and that anything discovered through the execution of the search warrant would have only been the fruit of the poisonous tree.

      iii.    *The Search Warrant is Also Facially Deficient because the Affidavit Admits that the Officers Conducted an Illegal Search.*

Notably, the affidavit *does* include the dog-sniff search that was patently unconstitutional. This makes paragraphs 12 through 14 facially deficient. Judge Paty should have been aware of this conduct was patently unconstitutional and should not have authorized the warrant.

      iv.    *The Affidavit for the Search Warrant Lacks Indicia of Probable Cause Once the Violative Portions are Excised.*

After excising paragraphs 3 through 5, and paragraphs 12 through 15 of the affidavit, there is not probable cause to issue the search warrant. The first two paragraphs include the address of the home and the fact that Mr. Broome had warrants out for his arrest. Paragraphs 6 through 11 describe "aluminum foil pieces" on the ground in the driveway, the two vehicles that were in the driveway, and the conversation with Ms. Sneed where she explains that Mr. Broome was living inside the shed and drove both vehicles. This information is wholly insufficient to show probable cause to issue a warrant to enter and search the *shed*. This information would not even be sufficient for a hunch that evidence of contraband would be found in the shed. For this, pursuant to *Franks*, "the search warrant must be voided and the fruits of the search excluded. *Franks*, 438 U.S. at 156.

**G.  The Good Faith and Inevitable Discovery Exceptions Do Not Apply.**

When the police obtain evidence through a violation of the Fourth Amendment, the trial court must exclude that evidence at the defendant's trial. *Byars v. United States*, 273 U.S. 28, 29-

30 (1927). Like the exceptions to the general warrant requirement, only a few recognized exceptions can prevent the exclusion of evidence.

      i.     *The Good Faith Exception Does Not Apply Because the Search Warrant Contains a Knowing and Reckless Falsity, the Magistrate Should Have Recognized a Clear Violation Admitted in the Affidavit, and Because the Warrant is Facially Deficient.*

The exclusionary rule does "not bar the government's introduction of evidence obtained by police officers acting in objectively reasonable reliance on a search warrant that is subsequently invalidated." *United States v. Laughton*, 409 F.3d 744, 748 (6th Cir. 2005). "The good-faith exception, however, does not apply in four situations: (1) when the affidavit supporting the search warrant contains a knowing or reckless falsity; (2) when the magistrate who issued the search warrant wholly abandoned his or her judicial role; (3) when the affidavit is so lacking in indicia of probable cause that a belief in its existence is objectively unreasonable; or (4) when the warrant is so facially deficient that it cannot reasonably be presumed valid." *United States v. McPhearson*, 469 F.3d 518, 525 (6th Cir. 2006). At least three of these four situations exist in Mr. Broome's case.

First, as established above, the warrant contains false statements and omissions that were included knowingly or recklessly. Mr. Broome was not arrested inside of the shed, and the affidavit omits several Fourth Amendment violations that were key parts of the chains of events that led to the issuance of the warrant. Second, Judge Paty should have recognized that the dog sniff search violated the *Jardines* Supreme Court case law because a dog sniff search is a search under the Fourth Amendment for which either a warrant or consent is required. Despite this admission in the affidavit, Judge Paty still issued the warrant. This second situation intertwines with the fourth listed in *McPhearson*; the admitted constitutional violation in the affidavit makes

the affidavit facially deficient. Issuing the search warrant only permitted the officers to search for and seize evidence that would inevitably be fruit of the poisonous tree.

ii.    *The Inevitable Discovery Exception to Exclusionary Rule Does Not Apply Because the Officers Did Not Possess the Lawful Means of Obtaining the Evidence at the Time of the Unconstitutional Searches.*

Evidence is admissible despite a Fourth Amendment violation only if law enforcement would have discovered the evidence "wholly independent of any constitutional violation." *Nix v. Williams*, 467 U.S. 431, 443 (1984). "[T]he inevitable discovery exception applies when, at the time of the unlawful search, there was a separate independent line of investigation underway or there are compelling facts indicating that the disputed evidence would have inevitably been discovered. *United States v. Kennedy*, 61 F.3d 494, 498 (6th Cir. 1995). The government must show by a preponderance of the evidence that an "independent, untainted investigation . . . inevitably would have uncovered the same evidence as that discovered through the illegal search." *United States v. Haddix*, 239 U.S. 766, 769 (6th Cir. 2001).

The Sixth Circuit has acknowledged that "[t]he inevitable discovery doctrine is conceptually more problematic . . . because it involves a degree of deducing what would have happened rather than simply evaluating what actually happened." *United States v. Leake*, 95 F.3d 409, 412 (6th Cir. 1996). For this, courts must keep speculation "to a minimum" and instead "focus on demonstrated historical facts capable of ready verification or impeachment." *Id.* Courts must "look at the facts at the time they existed at the instant before the unlawful search, and determine what would have happened had the unlawful search not occurred." *Kennedy*, 61 F.3d at 498 (6th Cir. 1995) (citing *United States v. Eng*, 971 F.2d 854, 861 (2d. Cir. 1992)).

The inevitable discovery rule may apply if police officers possess a warrant at the time of the constitutional violation. *See United States v. Alexander*, 540 F.3d 494, 503 (6th Cir. 2008). In *Alexander*, the officers arrested the defendant inside his home while executing a search warrant.

20

*Id.* at 498. After handcuffing the defendant but prior to issuing *Miranda* warnings, the officers told the defendant to "admit where the cocaine was." *Id.* The defendant's response led officers to the location of contraband in the home. *Id.* The Sixth Circuit held that the inevitable discovery exception applied because the officer possessed a search warrant for the home at the time of the *Miranda* violation and would have located the contraband once the officers fully searched the home. *Id.* at 504.

However, if law enforcement does not possess a search warrant at the time of an unlawful search of a home, the inevitable discovery doctrine does not apply—even if law enforcement had probable cause to obtain a warrant. *United States v. Haddix*, 239 F.3d 766, 768 (6th Cir. 2001). In *Haddix*, the officers arrived at the defendant's home after a police helicopter observed marijuana growing behind the house. *Id.* at 766. While approaching the house, the officer saw marijuana plants and power lines running to other buildings on the premises. *Id.* From the defendant's porch, the officers observed an assault rifle inside the home. *Id.* at 767. Without a warrant, the officers entered the home and seized the firearm. *Id.* The officers went further into the home, finding two more guns, marijuana, and the defendant. *Id.* Thereafter, the officers obtained a search warrant, but only "well after they invaded [the defendant's] home." *Id.* at 767. In *Haddix*, the government argued that the inevitable discovery doctrine applied because probable cause existed for the search warrant that the officers obtained. *Id.* at 768. Despite agreeing that probable cause existed for a warrant, the Sixth Circuit refused to apply the inevitable discovery doctrine because the government's position, if correct, would "completely obviate the warrant requirement" and "radically depart[] from the Fourth Amendment warrant requirement precedent." *Id.* (quoting *United States v. Johnson*, 22 F.3d 674, 683-84 (6th Cir. 1994)).

21

The Sixth Circuit reached a similar conclusion more recently in *United States v. Quinney*, 583 F.3d 891 (6th Cir. 2009). In *Quinney*, the officers entered the defendant's home without a warrant and seized evidence. *Id.* at 893. Prior to entering the defendant's home, the officers spoke with witnesses and likely developed probable cause for a search warrant, but did not take the steps to apply for one. *Id.* The government in *Quinney* argued that the inevitable discovery doctrine applied because the officers had probable cause to obtain a search warrant at the time of the unlawful search and seizure. *Id.* at 894. The Sixth Circuit noted that it had "emphatically reject[ed]" the government's argument in numerous cases, and again "reject[ed] the government's attempt to circumvent the [warrant] requirement via the inevitable discovery doctrine." *Id.* at 894-95.

Inevitable discovery does not apply even if the officers unlawfully search the home while they are *simultaneously* in the process of acquiring a search warrant. *United States v. Griffin*, 502 F.2d 959 (6th Cir. 1974). In *Griffin*, the officers developed probable cause for a search of the defendant's apartment and sent an officer to obtain a search warrant. *Id.* at 960. While this officer was away, the others went directly to the defendant's apartment and "forcibly enter[ed] it." *Id.* The officers searched the home again four hours later upon receiving the warrant. *Id.* Like in *Haddix* and *Quinney*, the government argued that the inevitable discovery doctrine applied because the officers had probable cause and were in the process of getting a warrant. *Id.* The Sixth Circuit again rejected this argument, explaining that "police who believe they have probable cause to search cannot enter a home without a warrant merely because they plan subsequently to get one." *Id.* at 961.

Here, Mr. Broome's case is analogous to *Quinney*, *Haddix*, and *Griffin*, and distinguishable from *Alexander*. Like those cases, there was never a separate independent

investigation that would have otherwise discovered the evidence at issue in Mr. Broome's case. Each illegal entry into the shed (including the dog sniff search) was a part of the course of the same investigation. The officers did not have a warrant during the first three entries into the shed or at the time of the dog-sniff search. Because of this, the independent discovery doctrine cannot apply. The fact that the officers eventually obtained a warrant does not cure the constitutional violation that these officers caused.

In addition, although Mr. Broome does not concede that there was probable cause for a search warrant, even if there were probable cause, the officers still failed to obtain a search warrant before the entering and searching the shed or performing the dog sniff. Arguably, the officers may have been in the process of getting a search warrant during the third warrantless entry, but even this is insufficient under *Griffin*. The bright line rule is that the officers need to have possessed the lawful means of discovery—the warrant itself in Mr. Broome's case—at the time that the constitutional violation occurred. These officers did not. For this, the inevitable discovery doctrine does not apply, and the Court must exclude the evidence seized from the shed, most notably the firearm for which the United States has charged Mr. Broome.

### III. <u>CONCLUSION</u>

Wherefore, Mr. Jared Broome respectfully moves this Honorable Court to issue an order suppressing: 1) the evidence that law enforcement found within the shed resulting from five unconstitutional searches, and 2) his statements to law enforcement after his arrest. Additionally, Mr. Broome requests a *Franks* hearing to contest the validity of the search warrant.

RESPECTFULLY SUBMITTED:

FEDERAL DEFENDER SERVICES OF
EASTERN TENNESSEE, INC.

BY:     s/ *Christopher Meadows*
        Christopher Meadows
        District of Columbia Bar No. 1779087
        Federal Defender Services
        835 Georgia Ave., Suite 600
        Chattanooga, TN  37402
        (423) 756-4349